UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL |
| Plaintiff, | ) | McAllen, Texas |
| | ) | Tuesday, September 23, 2008 |
| vs. | ) | (1:31 p.m. to 2:42 p.m.) |
| ONESIMO CRUZ, | ) | CASE NO: 4:08-CR-620-05 |
| OLEGARIO FLORES GARCIA, | ) | CASE NO: 4:08-CR-620-07 |
| LUIS ARIEL RIVERA-RODRIGUEZ, | ) | CASE NO: 4:08-CR-620-08 |
| CLARISSA LIZEBETH GONZALEZ, | ) | CASE NO: 4:08-CR-620-12 |
| Defendants. | ) | |

CONFLICT OF INTEREST AND DETENTION HEARING
(DEFENDANTS CRUZ AND FLORES GARCIA);

DETENTION HEARING
(DEFENDANTS RIVERA-RODRIGUEZ AND GONZALEZ)

BEFORE THE HONORABLE DORINA RAMOS,
UNITED STATES MAGISTRATE JUDGE

Appearances: See next page

Interpreter: Woody Lewis

Court Recorder: Vicky Vasquez

Transcribed By: Exceptional Reporting Services, Inc.
14493 S. Padre Island Drive
Suite A-400
Corpus Christi, Texas 78418-5940
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES FOR:**

| | |
|---|---|
| **Government:** | **MICHELLE ALLEN-McCOY, ESQ.**<br>**Assistant United States Attorney**<br>**1701 W. Business Hwy. 83**<br>**Suite 600**<br>**McAllen, Texas 78501** |
| **Onesimo Cruz:** | **GUY WOMACK, ESQ.**<br>**402 Main Street, Suite 6 North**<br>**Houston, Texas 77002** |
| **Olegario Flores Garcia:** | **GEOFFREY LEE WOMACK, ESQ.**<br>**402 Main Street, Suite 6 North**<br>**Houston, Texas 77002** |
| **Luis Rivera-Rodriguez:** | **SANTOS MALDONADO, ESQ.**<br>**209 E. University Dr.**<br>**Edinburg, Texas 78539** |
| **Clarissa Gonzalez:** | **KYLE WELCH, ESQ.**<br>**Assistant Federal Public Defender**<br>**1701 W. Business Hwy. 83**<br>**Suite 405**<br>**McAllen, Texas 78501** |

**INDEX**


| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jose Ricones | 6 | | -- | |
| By Mr. Guy Womack | | 12 | | -- |
| By Mr. Geoff Womack | | 23 | | -- |
| By Mr. Maldonado | | 27 | | -- |
| By Mr. Welch | | 32 | | -- |
| **DEFENSE WITNESS** | | | | |
| Irma Rivera | 36 | 41 | 43 | -- |
| **GOVERNMENT'S RECOMMENDATION** | | 45 | | |
| **ARGUMENT** | | | | |
| By Mr. Welch | 44/53 | | | |
| By Mr. Guy Womack | 48 | | | |
| By Mr. Geooff Womack | 50 | | | |
| By Mr. Maldonado | 51 | | | |
| **COURT'S RULING** | 54 | | | |

**McAllen, Texas; Tuesday, September 23, 2008; 1:31 p.m.**

**(Call to Order)**

**(Official Interpreter Utilized for Translation)**

**THE COURT:** Let me go ahead and call the Detention Hearing. Let me -- let's go ahead start with Onesimo Cruz. This is a Houston case, their Cause Number 08-616.

**MS. ALLEN-MCCOY:** The Government is present and ready regarding all Defendants.

**MR. GUY WOMACK:** Your Honor, Guy Womack for Mr. Cruz.

**THE COURT:** And Olegario Flores-Garcia. Luis Ariel Rivera-Rodriguez.

**MR. GEOFF WOMACK:** Geoff Womack for Mr. Garcia, your Honor.

**MR. MALDONADO:** Santos Maldonado for Mr. Rivera, your Honor.

**THE COURT:** Okay. And Clarissa Lizebeth Gonzalez.

**MR. WELCH:** Kyle Welch, your Honor, for Ms. Gonzalez.

**THE COURT:** Okay. Now, Mr. Womack -- as to Mr. Cruz and Mr. Garcia, Mr. Womack, you had indicated that you were going to check with the State Bar?

**MR. GUY WOMACK:** Yes, your Honor. I did and also I had printed for the Court two cases, Fifth Circuit cases relevant to this issue and I provided copies to the Government.

**THE COURT:** Okay. Well, let me address Mr. Cruz. Mr. Cruz and Mr. Garcia, you have hired -- or, Mr. Cruz, you

hired Mr. Guy Womack?

**DEFENDANT CRUZ:** Yes, your Honor.

**THE COURT:** Okay. And you also know that another member of his law firm and I believe his son --

**MR. GEOFF WOMACK:** Yes, your Honor.

**THE COURT:** Okay -- was hired by Mr. Garcia.

**DEFENDANT CRUZ:** Yes, your Honor.

**THE COURT:** And do you understand that, Mr. Garcia?

**DEFENDANT FLORES-GARCIA:** Yes, your Honor.

**THE COURT:** And do you understand that they work together and although each represents you, there might be conversations or there might be certain conflicts that may arrive in the future? Do you understand that, Mr. Cruz?

**DEFENDANT CRUZ:** Yes, your Honor.

**THE COURT:** And Mr. Garcia?

**DEFENDANT FLORES-GARCIA:** Yes, your Honor.

**THE COURT:** All right. And you want to proceed with Mr. Guy Womack, Mr. Cruz?

**DEFENDANT CRUZ:** Yes, your Honor.

**THE COURT:** And Mr. Garcia?

**DEFENDANT FLORES-GARCIA:** Yes, your Honor.

**THE COURT:** All right. Apparently, your attorneys have looked into the matter and they believe that there is no conflict. This is a Houston case and it is still up to Houston as to whether or not they're going to inquire further into

this. All right?

**DEFENDANT CRUZ:** Yes, your Honor.

**THE COURT:** All right. Until then, let's go ahead and get started on the Detention Hearing. Are we ready to proceed?

**MR. GUY WOMACK:** Yes, your Honor, we are. Thank you.

**THE COURT:** Okay. Have seats, please. Mr. Maldonado --

**MR. MALDONADO:** I'm sorry, your Honor?

**THE COURT:** -- ready to proceed on the Detention --

**MR. MALDONADO:** Ready, your Honor. I'm sorry.

**THE COURT:** Okay. Go ahead and have a seat, please. I was looking forward to meeting Mr. Mason. He's not going to show up here?

**MS. ALLEN-MCCOY:** No, your Honor. At this time, your Honor, the Government would ask to call Special Agent Ricones to the stand.

**JOSE RICONES, GOVERNMENT'S WITNESS, SWORN**

**THE COURT:** Have a seat, please.

**DIRECT EXAMINATION**

**BY MS. ALLEN-MCCOY:**

Q And, sir, will you, please, state your full name for the Court?

A Jose Ricones.

Q And where are you currently employed?

A With the Drug Enforcement Administration.

Q And how long have you been employed with the DEA?

A Approximately four years.

Q Okay. And in your capacity as a DEA agent, are you familiar with the case that's before the Court here today?

A Yes.

Q Okay. With regard to Defendant Onesimo Cruz and Mr. Flores-Garcia, can you describe for the Court the evidence that the -- that you were aware of against those two Defendants with regard to the money laundering and conspiracy to possess with intent to distribute both cocaine and marijuana?

A This is an ongoing case from Houston. Probably -- approximately the last two years in working this case, they were doing physical surveillance and electronic surveillance and we've -- well, they've encountered conversations and gathered evidence against Garcia and Cruz regarding their bulk currency shipments from Houston -- from the Houston area down to the Valley area and then across into Mexico.

Q Okay. And you had mentioned the electronic surveillance that you're aware of. Can you describe the nature of the intercepted telephone conversations involving Mr. Cruz and Mr. Garcia?

A Yes. The two subjects were in contact with members of the Gulf Cartel in Mexico relating to the transport of marijuana, of drugs and bulk currency.

Q And when you say they were discussing marijuana, for example, what quantities of marijuana were they discussing?

A Ton quantities.

Q And with regard to cocaine, what type of quantities were they discussing with regard to cocaine?

A Hundred kilo quantities.

Q And the marijuana and the cocaine, where was that going from or to?

A The marijuana and the cocaine were being transported from Mexico across into --

**THE COURT:** Hold on. Can you fix the feedback? I think it’s this one. Okay. Go ahead, sir.

**THE WITNESS:** The marijuana and the cocaine were being transported across from Mexico in the Roma area and into the U.S. and subsequently up to the Houston area and the leaders of the cartel would make the arrangements to have that transported and Cruz and Garcia would act as a surveillance or they would coordinate the shipments up to the Houston area.

Q And with regard to the bulk currency, where was that traveling from or to?

A From the Houston area -- actually, from all over the U.S., from Chicago area, Atlanta area but Cruz and Garcia were mainly in charge of the transport once it arrived in the Valley area and then they’d take it to the Roma area and across into Mexico.

Q And were Cruz or -- Mr. Cruz or Mr. Garcia actually transporting the bulk currency or what was their role?
A They weren't physically. They would pretty much coordinate the loads. They'd hire somebody else to drive the bulk currency and they would act as countersurveillance and make sure that the loads would get to the destination.
Q And during the course of the investigation based on the electronic surveillance, was there -- were there any bulk currency shipments that were intercepted?
A Yes. There was approximately four different seizures. There was three -- one, two, three. I believe there was three seizures related to Cruz and Garcia.
Q Okay. Was there a seizure on February 26th of 2008?
A Yes.
Q Do you recall the amount of currency that was seized on that occasion?
A I believe it was approximately 2.4 million.
Q And were Mr. Cruz or Mr. Garcia visually observed prior to the seizure of that 2.4 million?
A Yes, they were.
Q And what was their role on that seizure?
A They were acting as countersurveillance.
Q And another Defendant, Ms. Clarissa Gonzalez, was she present on February 26th of 2008?
A Yes, she was.

Q And what was her role on that date?

A She was just acting -- she was a passenger in the vehicle that had the bulk currency.

Q And was there a second seizure on March 29th of 2008?

A Yes, there was.

Q And do you recall the amount that was seized on that occasion?

A I believe it was approximately 1.4 million.

Q And there was another seizure on April 20th of 2008; is that right?

A Yes.

Q And do you recall what the -- the amount that was seized on that date?

A I believe it was approximately 1.2 million.

Q And based on the intercepted telephone conversations, are you aware of where this money was coming from, what it was the proceeds of?

A From -- they were drug proceeds.

Q With regard to Mr. Rivera, were there any intercepted phone calls regarding Mr. Rivera?

A Yes. There was intercepted calls from -- between Rivera and members of the Gulf Cartel relating to the transport of the bulk currency into Mexico.

Q And based on the intercepted telephone conversations involving Mr. Rivera, were there any seizures of bulk currency

related to Mr. Rivera?
A Yes. There was a seizure approximately in -- back in May of last year, 2007, of approximately 1.4 million.
Q And where was that money seized?
A From a vehicle subsequent to a traffic stop and it was in a duffle bag in the back of the seat.
Q And that was at the Hidalgo Port of Entry?
A It was nearby it, yes.
Q Okay. And the vehicle was going toward Mexico at the time?
A Yes.
Q And the driver of the vehicle -- Mr. Rivera was not the driver of the vehicle; is that right?
A Correct, he wasn't.
Q Was the driver of the vehicle able to identify who it was that he was transporting the bulk currency for?
A Yes. He identified Mr. Rivera and took agents to Rivera's house where the vehicle was picked up from.
Q And at Mr. Rivera's house, was there ever a search conducted of that residence?
A Yes. There was a search conducted and several rifles and weapons, pistols, ballistic vests and other bulk currency was found at the residence.
Q And when Mr. Garcia and Mr. Cruz were arrested, are you aware of any weapons that were found on their person or at

their residences?

A Yes. They were both arrested with several handguns. Mr. Cruz had a semiautomatic rifle. During the actual apprehension, Mr. Garcia had a pistol as well.

**MS. ALLEN-MCCOY:** Your Honor, at this time I'll pass the witness.

**THE COURT:** Okay. Mr. Womack?

**MR. GUY WOMACK:** Yes, your Honor.

**THE COURT:** Go ahead.

**MR. GUY WOMACK:** Thank you, your Honor.

**CROSS EXAMINATION**

**BY MR. GUY WOMACK:**

Q Special Agent, what is your name again?

A Joe Ricones.

Q I'm sorry?

A Ricones.

Q Now, are you a DEA in McAllen?

A In McAllen, yes, sir.

**THE COURT:** Mr. Womack, you may be seated. You may be seated.

**MR. GUY WOMACK:** Oh, thank you, your Honor.

**BY MR. GUY WOMACK:**

Q Special Agent Ricones, can you see me okay?

A Yes, I can.

Q Okay. On the day that you arrested Mr. Cruz, okay, who

sits beside me here in court, what day was that?
A That was the 16th of September.
Q Of September. And on 16 September, you arrested him at his home?
A Right.
Q About what time of day was that?
A It was approximately 6:00 in the morning. I wasn't actually present during the arrest but other agents from the office were but it was approximately 6:00 a.m.
Q And it was about 5:30 in the morning, wasn't it?
A It was approximately 6:00 a.m.
Q 6:00 a.m. as you recall, okay. And when the agents got there, was Mr. Cruz in bed?
A No, he wasn't.
Q Okay. So he was up and about already?
A Right. I believe they had seen him come by or he -- I believe Mr. Cruz had just gotten there.
Q Okay. Now, as you know from looking at the reports, you know that there were -- he was not carrying any weapons on his person, correct?
A Correct.
Q But there were weapons in his home?
A Right.
Q And do you know that Mr. Cruz is a U.S. citizen?
A Right.

Q And he has a Concealed Handgun License.
A Okay.
Q No. You know that, correct?
A I don't.
Q Do you not know from the report that he showed his handgun license to the agents?
A Right. But also he had -- he made mention to the agents saying that he had the weapon in hand before he actually knew it was the agents.
Q Okay. And the weapon that you're talking about was a weapon that was in his home?
A Right, on the counter. I believe it was the kitchen counter.
Q Could it have been in a bedroom upstairs?
A I'm not sure.
Q Okay. But nonetheless, the weapon that you're talking about that you found that you're attributing to Mr. Cruz was inside his home?
A Right.
Q And you know that he is a Texas Concealed Handgun licensee?
A I did not know that.
Q Haven't the other agents told you that?
A No.
Q Did they not seize that record -- that document?

A I'm not sure.

Q Okay. So you're basing this on what you've heard from others?

A Right.

Q Okay. Now, in preparing for your testimony today, have you had a chance to read the DEA-6s done by your fellow agents?

A Not totally.

Q Have you read any of them?

A Yes.

**MR. GUY WOMACK:** Your Honor, pursuant to Federal Rule of Criminal Procedure 26.2, we ask to be allowed to see --

**THE COURT:** Do you have them with you?

**THE WITNESS:** I don't have them in hand with me, no.

**THE COURT:** He doesn't have them with him. Move along, sir. You'll get -- you'll be able to look at them later.

**MR. GUY WOMACK:** Thank you, your honor.

**BY MR. GUY WOMACK:**

Q Mr. Ricones, you mentioned recordings -- well, first, let's take right here. When the agents went to Mr. Cruz's home, they arrested him without any incident, correct?

A Correct.

Q In fact, he was very cooperative?

A Yes.

Q And you know that he was taken from his home in Roma to

McAllen?

A Yes.

Q Were you there when he was interrogated in McAllen?

A No.

Q But you know that before he arrived in McAllen, I had faxed a letter to the DEA telling them that I represent Mr. Cruz?

**MS. ALLEN-MCCOY:** Objection, relevancy.

**THE COURT:** Sustained.

**MR. GUY WOMACK:** It goes to his cooperation, your Honor.

**THE COURT:** Well, just ask --

**MR. GUY WOMACK:** I can show the relevance.

**THE COURT:** -- just ask if he cooperated, period.

**MR. GUY WOMACK:** Okay. Thank you. Thank you, your Honor.

**BY MR. GUY WOMACK:**

Q Special Agent Ricones, in fact, when Mr. Cruz got to McAllen, he talked to the agents, didn't he?

A Yes, he did.

Q But you know for a fact that he was already represented by an attorney, don't you?

A I did not.

Q Had they not told you that they got my letter?

**MS. ALLEN-MCCOY:** Objection, relevancy.

**THE COURT:** Sustained.

**MR. GUY WOMACK:** Well, your Honor, it's relevant as a legal matter. If their interview was represented by Counsel, it may -- this may show that it was --

**THE COURT:** He doesn't know.

**MR. GUY WOMACK:** Okay.

**THE COURT:** Move along.

**MR. GUY WOMACK:** Thank you, your Honor.

**BY MR. GUY WOMACK:**

Q Special Agent Ricones, you mentioned bulk transfers of currency --

A Yes.

Q -- and you say there were three of them that you think Mr. Cruz was involved in?

A Correct.

Q One was February 20 --

A 6th.

Q -- 6th of 2008. I didn't catch the second date.

A There was one in February, March and April.

Q And the March one was March 29th?

A I believe so.

Q Okay. Okay. I just didn't catch the first of the month. On the seizure in -- well, in all three seizures, was the currency bound pretty much the same way?

A Yes.

Q And how was that?
A They all had the amounts on the outside. They were in duffle bags and just in bundles and then individual bundles, big bundles with different markings on the outside.
Q And it was huge amounts of cash?
A Correct.
Q Would you agree that anyone in law enforcement who would see those bundles of cash in these vehicles would have immediately known that, hey, this looks like drug proceeds?
A I wouldn't know.
Q Well, I mean, did you think that when you saw it?
A I wasn't there during the seizure but, I mean --
Q Would a lawman like yourself have looked at that and said, "Oh, look, they've got a lot of savings" or would they thought, "Hey, that's probably drug proceeds"?
A Yes, probably.
Q Okay. And you've seen this many times in your career?
A Yes.
Q Was there anything about the way this money was packaged on these three occasions that in some way could have concealed from law enforcement the nature of what that money was?
A I don't think so.
Q In other words, it wasn't, like, wrapped up in bank wrappings, was it?
A No.

Q And there was nothing in there that said -- that identified that money as money being sent back to Washington to be destroyed because it was old, nothing like that, right?
A No.
Q All right. So anyone who would have found that money -- any lawman that found that money would have been suspicious that this looks like drug proceeds?
A Right.
Q And it was in vehicles that were headed south from Houston?
A Right. Not all from -- I mean, the vehicles were -- they were all in different locations but, yeah, they were heading south towards Mexico.
Q Okay. Now, did agents stumble across the money on these three occasions or did you-all know to look for those vehicles with that money?
A We knew from the interceptions from the electronic surveillance.
Q Okay. So you-all knew what you were looking for and found these vehicles and stopped them?
A Right.
Q And then found the money where you thought it would be?
A Right. I mean, within the vehicle, somewhere within the vehicle.
Q Okay. And on all the occasions the money was found, was

it, like, just hidden somewhere in the vehicle or concealed in the vehicle?

A It wasn't in any special compartments. It was within bags or duffle bags.

Q Okay. So people that would walk by the vehicle may not see that it was money? They would just see bags?

A Right.

Q And if you opened the bags, you'd find, "Oh, my gosh, there's a huge amount of cash"?

A Right.

Q Okay. Now, are you aware of Mr. Cruz doing any kind of transactions with this money to try to disguise it, such as first running it through the records of a carwash?

A I don't know, sir.

Q Okay. All you know is that he apparently was involved in carrying cash --

A The transport, correct.

Q -- from the Houston area down here?

A Correct.

Q And you said that you think his involvement was in countersurveillance?

A Yes. We actually -- during that February seizure, we surveyed him from the Roma area with Garcia and head towards Elsa and they were in -- they were following the money vehicle, the vehicle that was supposed to have -- or was going to be

loaded with the money arrive in location and was switched out with somebody else. A couple minutes later, that's when the money -- the vehicle was returned to Ms. Gonzalez and the driver and Mr. Garcia and Onesimo were -- they followed the vehicle back towards the Roma area.

Q And so if I understand correctly, the -- that's called the load vehicle that had the actual money. What kind of vehicle was that? Was it, like, a car, suburban --

A It was a sedan, right.

Q It was a car?

A Yeah, a four-door car.

Q Okay. And so you're saying that what you saw as countersurveillance was that car was on the road driving towards Roma and Mr. Cruz was in a car that was going towards Roma?

A Right. But we -- through the electronic surveillance as well, he would spot our vehicles and tell them, you know, "Watch out. There's suspicious vehicles following us. Stay back."

Q Okay. So you were listening in to phone conversations made by Mr. Cruz?

A Yes.

Q Were you listening to his phone or someone else's phone?

A His.

Q So you had a Court-ordered wire tap of his phone?

**MS. ALLEN-MCCOY:** Objection, relevancy.

**THE COURT:** Sustained.

**MR. GUY WOMACK:** I'm just trying to figure out how they know this.

**THE COURT:** Well, you already know.

**MR. GUY WOMACK:** Okay.

**THE COURT:** Move along.

**BY MR. GUY WOMACK:**

Q Do you know if it was Mr. Cruz that you were listening to?

A I don't know. I mean, the phone was -- I mean, the agents got a Court order. So --

Q But it was just for a cell phone?

A Correct.

Q And so you-all were guessing that cell phone probably was being used by Mr. Cruz?

A Well, they also got -- it's called a "Ping" where you get the GPS location of the phone and it came back to Cruz, to wherever he was at.

Q Okay. And if you know, this Ping from GPS, how exact is that? Would that mean that it was -- the signal was coming from someone within 20 yards?

**THE COURT:** Mr. Womack, we're not going to get into that. Now, move along.

**MR. GUY WOMACK:** Thank you, your Honor.

//

**BY MR. GUY WOMACK:**

Q Special Agent Ricones, the seizure in February of 2008, that was the first one that you were involved in, to your knowledge, that involved Mr. Cruz, correct?

A As far as I know, yes.

Q Okay. Thank you.

**MR. GUY WOMACK:** No further questions, your Honor.

**THE COURT:** Mr. Womack?

**CROSS EXAMINATION**

**BY MR. GEOFF WOMACK:**

Q Is it Agent Ricone (pronounced phonetically)?

A Ricones.

Q Ricones. Sorry about that.

A Okay.

Q Just a couple questions. On the -- you mentioned three seizures of money. Two of them involved Mr. Garcia?

A Three of them.

Q All three of them. And what was Mr. Garcia doing in those situations?

A He’s pretty much the right-hand man to Cruz. So wherever Cruz would go, Garcia was involved as --

Q His guardian?

A -- his --

Q I’m sorry. Go ahead.

A It was the same thing as countersurveillance or, you know,

helping out with the transport.

Q Was Garcia driving the vehicles, sitting passenger in the vehicle front seat --

A He would be driving his own vehicle. They also had scanners and radios to detect law enforcement.

Q So Garcia was driving his own vehicle and Cruz was driving his own vehicle?

A Correct.

Q Did you ever listen on any conversations of Garcia talking to anybody?

A What do you mean?

Q You said you had electronic surveillance on the telephones or cell phones, I assume. Did you ever hear anything from Garcia through a cell phone? Did you ever hear him talking to anybody about money or countersurveillance or anything like that?

A Yes.

Q What was it that you heard Garcia say?

A Well, relating to the same thing, you know, look out, watch out. There’s -- don’t move. Wherever -- Cruz and Garcia would be in front and back of the vehicles, of the load vehicles.

Q How did you know it was Garcia speaking?

A From surveillance, from countersurveillance, from some actual physical surveillance from the agents out there.

Q Backing up to when you -- or when DEA McAllen arrested Mr. Garcia, about what time of the morning was that?
A It was around the same time, around 6:00 a.m.
Q Was Mr. Garcia in bed, in the kitchen? What was he doing?
A I don’t know. I believe he was in bed. I wasn’t at that residence.
Q Was Mr. Garcia found with any type of weapon on his person?
A Yes. The agent said he had a weapon. I believe it was a .38 pistol.
Q Did he come out waving it at DEA McAllen?
A I don’t know.
Q In your years of law -- how long have you been with the DEA McAllen?
A About four years.
Q What did you do prior to DEA McAllen?
A I was a Border Patrol Agent.
Q In your -- how many years did you do that?
A A total of ten years.
Q So in 14 years total of law enforcement, if someone came to a house at 6:00 a.m. in the morning unknown to somebody and they had a Concealed Handgun license, would you be surprised if they came out with a pistol to see what was going on at their house?
A I don’t -- I mean, he was -- this was -- I’m not sure if

he the surveillance or if it was Cruz had the actual cameras outside their residence that spotted -- but before the entry, a DEA announces whenever they make an entry to the residence, “Police DEA, search warrant, arrest warrant.”

Q Are you aware that Mr. Garcia has a Concealed Handgun license?

A No, I don’t.

Q And that the agents at that day took his card so they have it in the record in file?

A I wasn’t aware.

Q Are you aware of Mr. Garcia trying to conceal the money -- the way the money got there, that it was drug proceeds or anything like that? Did he try to make it look like it was going to a bank to be deposited or anything similar to that nature, trying to disguise the nature of the money?

A Right. No, it was just, you know, bulk currency in duffle bags.

Q And you said in each load it was just in bags in plain view?

A Yeah, in either trash bags or duffle bags.

**MR. GEOFF WOMACK:** No further questions, your Honor.

**THE COURT:** Mr. Maldonado?

//

//

//

**CROSS EXAMINATION**

**BY MR. MALDONADO:**

Q Mr. Ricones, regarding Mr. Rivera, my client Luis Rivera, was there ever any -- was he ever close to or nearby any of the money seizures?

A No. As far as I know, no, I don't.

Q Okay. Was he ever associated with Mr. Cruz or Mr. Garcia in any form or manner as to whatever they did?

A I don't know on those seizures if he was actually tied -- I believe he was just tied into that first seizure of that 1.4 million.

Q Okay. Your testimony is that back in May '07, there was a seizure of 1.4 million?

A Yes.

Q In fact, it says, "$1,449,860"; is that right?

A I believe so, yes.

Q You know that figure is incorrect, right, sir?

A As far as I know, that's the numbers that -- on the Indictment and on the reports.

Q You know that this money was seized and there was a forfeiture actually filed in State Court?

A I've heard about that, that he was returned approximately 400,000, I believe.

Q $450,000.

A Okay.

Q In a settlement.

**MS. ALLEN-MCCOY:** Objection, relevance.

**THE COURT:** What is the relevance?

**MR. MALDONADO:** Your Honor, they're saying that this money is as a result of drug proceeds but obviously, there hasn't been a finding. In fact, they returned money to my client that they're now saying was drug money. I think it's very relevant, Judge.

**THE COURT:** Not for a Detention Hearing. Move along.

**BY MR. MALDONADO:**

Q You're aware that Mr. Rivera owns some petrol companies here?

A Yeah, I believe he owns a computer company and a petrol company.

Q All right. And you're aware that he deals in very large amounts of money through that business?

A I'm not aware of that.

Q Okay. If I mentioned to you that back in May '07, his bank account for that business had $718,000 roughly, that's news to you, sir?

A Yes.

Q That in July '07, he had credited to his account $1.4 million to that business?

A I'm not aware. I know through the electronic surveillance, he would work with high members of the cartel in

Mexico and a lot of that money was coming from there, through those conversations regarding that -- those -- that large amount of currency.

Q So you're saying that you're not aware of the wire transfers from different banks to his account through those months of over $1 million?

A I'm not.

Q You're saying that that money is drug cartel money, wire transferred to his account?

A According to those intercepted phone calls, yes.

Q These wire transfers were from petroleum companies and your testimony is that these petroleum companies are now laundering these monies and sending them directly to his account?

A I don't know about the specific businesses. I'm just relaying the information that we have from the members of cartel that are working with Mr. Rivera.

Q Okay. Besides the 1.4 million and his conversations that you say with drug cartel members, is there any other information, sir, that you have against Mr. Rivera as to the charges in the Indictment?

**MS. ALLEN-MCCOY:** Your Honor, that's vague and this is an ongoing investigation.

**THE COURT:** Be more specific.

//

**BY MR. MALDONADO:**

Q Well, is there any other -- do you have any other testimony, sir, besides the seizure of the 1.4?

A I don’t have any specific information related to that seizure, like -- you know, it is an ongoing investigation at this time.

Q You said that there is phone calls. Would you describe them as numerous or a few or --

A Numerous.

Q But not to Mr. Cruz or Mr. Garcia, right, sir?

A Yes. There’s -- I mean, there’s intercepted calls on everyone.

Q Okay. But I’m asking regarding Mr. Rivera to Mr. Cruz or Garcia.

A As far as I know, I don’t -- I’m not sure. I don’t know.

Q Regarding any weapons that were located at the residence of Mr. Rivera, Mr. Rivera was not at home; is that right, sir?

A I don’t know. During the search warrant or --

Q Yes, sir.

A I’m not sure.

Q The weapons weren’t used in form or manner, right?

A I don’t know. I just know that there were several weapons, ballistic vests, you know, ammunition, high-powered rifles, pistols.

Q But the information you have is not that he used these

weapons in any form in committing this allegation crimes?
A I don't know.
Q And would you say that Mr. Rivera's alleged involvement in this case is limited as to the timeframe sometime after the last seizure of April 20th, '08 to May '07?
A I don't know. I don't know if they have any current -- other current information regarding Rivera or not.
Q Okay. You don't have any information to tell us today that he was involved in any phone calls before May '07; is that right, sir?
A I don't believe so. I don't personally have any information. It's -- like I said, it's based out of Houston.
Q All right. The driver of the vehicle, sir, in which there was money seized back in May '07, that person, was he involved in this case at all?
A Yes.
Q And he was let go by the officials?
A Yes.
Q How were the agents -- I'm almost finished, your Honor. Thank you for being patient. How were the officials aware of Mr. Rivera's voice in any recordings, sir?
A I'm not sure. I don't know.
Q Has there been a voice matched?

**MS. ALLEN-MCCOY:** Your Honor, this goes to discovery.

**THE COURT:** Sustained.

**MR. MALDONADO:** I'll pass the witness. Thank you, Judge.

**MR. WELCH:** Thank you, your Honor.

**CROSS EXAMINATION**

**BY MR. WELCH:**

Q Agent Ricones, I represent Clarissa Gonzalez. You mentioned a -- you stated a minute ago that there were intercepted conversations on everyone. Were there intercepted conversations on Ms. Gonzalez?

A I don't believe so.

Q You testified that she was present in the car at the February the 26th, '08 seizure; is that correct?

A You know, I take that back. I believe she was -- there was a conversation between her and Cruz.

Q Okay. Would it have been prior to that date or do you know?

A Prior and after.

Q At any rate, she was a passenger in a car that was stopped on the February 26th, '08 seizure, correct?

A Correct.

Q When did -- if you know, did -- you stated this investigation had been going on for a couple of years; is that correct?

A Correct.

Q Do you know at what point that Ms. Gonzalez came on the

radar screen and when her name became associated with this case?

A I believe it was approximately this past year or so. I'm not sure. I'm not certain.

Q Would it have been long before the February the 26th seizure?

A I'm not sure.

Q You were asked about her role in that seizure and that was the only seizure -- or really the only overt that she was involved in; is that correct?

A She -- after the arrest -- after the seizure, she spoke with us regarding other seizures and according to her, Cruz would hire drivers and passengers for the transport of that bulk currency and that was her role.

Q You mean, in particular, as a passenger; is that correct?

A Correct.

Q She was not arrested on February the 26th; is that correct?

A No, sir.

Q I gather from what you say that she was interviewed and was well aware of the fact that she could have been arrested on that date?

A Yes.

Q Then she was arrested last week; is that correct?

A Yes.

Q Do you know where she was arrested?
A I believe it was at her apartment.
Q And where she lives in Roma; is that correct?
A Correct.
Q Do you know any -- were there any -- when the decision was made to arrest her, did law enforcement have any difficulty in locating exactly where she lives?
A Yes. I believe she had moved from a different apartment. So they got a current address and they found her at that apartment.
Q She hadn't left the area though; is that correct?
A Not as far as we know.
Q And you know that she was working at a pawn shop in Roma; is that correct?
A Correct.
Q And had been working there for some period of time; is that correct?
A Correct.

**MR. WELCH:** That's all I have at this time.

**THE COURT:** Ma'am, anything else?

**MS. ALLEN-MCCOY:** Nothing further, your Honor.

**THE COURT:** You may step down. Do any of you have any more questions?

**MR. GUY WOMACK:** No.

**THE COURT:** No? Okay. You may step down. Do you

have anything else on detention?

**(Witness stepped down)**

**MS. ALLEN-MCCOY:** No further witnesses, your Honor.

**THE COURT:** Okay. Do you have witnesses or proffers?

**MR. GUY WOMACK:** A proffer only, your Honor. We ask that your Honor consider the Pretrial Services Report and specifically I'd just like to highlight that my client is a naturalized U.S. citizen. He's 38 years old. He's been married 15 years. He has a 14-year-old and a 10-year-old children. He has worked for the same company for 14 years. He has very close ties to this community and has no prior convictions of any kind. Thank you, your Honor.

**THE COURT:** Okay. Mr. Womack?

**MR. GEOFF WOMACK:** Proffer only, your Honor.

**THE COURT:** Okay.

**MR. GEOFF WOMACK:** Again, we'd like you to recognize the Pretrial Services Report and highlight a couple of other things. Mr. Garcia is 43 years old. He's a naturalized U.S. citizen in May of 2000. He's lived in Roma, Texas for 23 years, is at his current residence for the past five. He's been married to his wife for 17 years. They have two children, a 17-year-old and a 12-year-old, both U.S. citizens. He has nine brothers and sisters living in Roma, Texas as well as his mother, who is there legally. He's been employed at the Rabbit Ranch for five years. If he was allowed to be out on bond, he

would continue his employment with the Rabbit Ranch. He's never been in trouble before in his life and has never been arrested. That's it, your Honor.

**THE COURT:** Mr. Maldonado?

**MR. MALDONADO:** Your Honor, we do -- we would like to call one witness if the Court allowed it.

**THE COURT:** Go ahead.

**MR. MALDONADO:** Yes. Ms. Irma Rivera and she needs an interpreter.

**THE COURT:** Okay. Go ahead and be sworn. Raise your right hand.

**IRMA RIVERA, DEFENDANT'S WITNESS, SWORN**

**THE COURT:** Okay. Have a seat over here. Go ahead, Mr. Maldonado.

**DIRECT EXAMINATION**

**BY MR. MALDONADO:**

Q Your name is Irma Rivera, ma'am?
A Yes.
Q And your husband's name is Luis Rivera?
A Yes.
Q And how long have you been married, ma'am?
A Eight years.
Q Do you have children together?
A Yes.
Q That's Luis Rivera?

A Yes.
Q All right. Do you have a son from a prior marriage, ma'am?
A Yes.
Q And he lives here?
A Yes.
Q And they're all going to school in the United States?
A Yes.
Q Your son attends the Military Academy in Harlingen?
A Yes.
Q Luis goes to a Montessori school here in the McAllen area?
A Yes. Edinburg.
Q And you-all live in Sharyland; is that right?
A Yes.
Q Your husband is a citizen of the United States?
A Yes.
Q A great substantial amount of his family is here in the United States?
A Yes.
Q Your husband does not or hardly ever travels to Mexico; is that right?
A Yes.
Q Your husband is the owner of a company called San Petrol, LLC?
A Yes.

Q And this business has existed for over two years, approximately two years and a half?
A Yes.
Q And from this income, you-all live off?
A Yes.
Q And you agree with me that this company financially does extremely well?
A Yes.
Q You and I have reviewed many bank statements from that business?
A Yes.
Q There’s some months that that account holds over $1.5 million?
A Yes.
Q Sometimes it’s 750,000?
A I don’t understand. If they appear?
Q Yes.
A Yes.
Q All right. This company consists of many, many tractors, trailers, tankers; is that right?
A Yes.
Q And the reliability and predictability of this company is that in the future it will be very, very successful?
A Yes.
Q Your husband works extremely hard to make this business

successful; is that right?
A Yes.
Q And at times, there's large amounts of cash that this business handles?
A Yes.
Q And almost 100 percent of the credits into that account are wire transfers from refineries; is that right, ma'am?
A Yes.

**MS. ALLEN-MCCOY:** Your Honor, I'm going to object at this point. It's unclear to me if she's the accountant for this company or what the basis for her knowledge is regarding the money going in or out of that bank account.

**THE COURT:** That is sustained. Go on to something else.

**MR. MALDONADO:** Yes, your Honor.

**THE COURT:** And Mr. Maldonado, you are aware he has other charges regarding that company?

**MR. MALDONADO:** I'm sorry?

**THE COURT:** You are aware he has other charges pending?

**MR. MALDONADO:** I have been advised, your Honor.

**THE COURT:** Okay. Well, he does. I think that it's by a Criminal Complaint.

**MR. MALDONADO:** Well, I know that one of these accounts was seized from the company but I don't know of any

other charges. They haven't told me this, Judge. I know that his bank account --

**THE COURT:** Hold on a second. Lupita, am I confusing Defendants? Doesn't he have a Criminal Complaint brought in by ICE?

**CASE MANAGER:** Not that I'm aware of, your Honor, but I'll do a search on the system.

**THE COURT:** Okay.

**MR. MALDONADO:** I believe that's an old -- I don't know of any information like that.

**THE COURT:** All right. Go on.

**MR. MALDONADO:** Yes, Judge.

**BY MR. MALDONADO:**

Q Now, ma'am, if your husband is granted a bond by this Court, is there any doubt in your mind that he will follow all the conditions this Court sets and appear at all court hearings, ma'am?

A No.

Q He will show up; is that right?

A Yes.

Q And you will do everything in your power and ability to make that happen; is that right?

A Yes.

Q The report written by Pretrial Services recommends a bond in your husband's case. You're asking the Court to adopt that?

A Yes.
Q If it is necessary that there be some collateral or guarantee for the bond, there is a piece of property that can be used as that guarantee; is that right?
A Yes.
Q Okay. And your husband doesn’t use drugs, does he, ma’am?
A No. He doesn’t consume drugs.

**MR. MALDONADO:** Pass the witness.

**CROSS EXAMINATION**

**BY MS. ALLEN-MCCOY:**

Q Ma'am, my name is Michelle McCoy. I'm an Assistant United States Attorney. I have just a few brief questions for you here today.

Ma'am, where are you and your husband currently living?
A In Mission.
Q And what's the address?
A 708 Brazos, in Mission, Texas.
Q And you live there with two children; is that right?
A Yes.
Q Ages 6 and 14?
A Yes.
Q Are you aware that law enforcement conducted a search of that residence in May of 2007?
A Yes.

Q And during the course of that search of your residence, you and your husband's residence, they found weapons to include assault rifles; isn't that right?

A Yes.

Q And they also found several hundreds of thousands of dollars in U.S. currency, didn't they?

A No.

Q Didn't they find money counters?

A No.

Q Didn't they find ballistic vests?

A No. As far as I know, no.

Q Now, your husband has a brother who still reside in Mexico; is that right?

A Yes.

Q And he owned a company based in Mexico for approximately six years; isn't that right?

A Yes.

Q And most recently that company -- he owned it from 2001 to 2007?

A The one in Mexico?

Q Correct.

A Yes.

Q And are you aware that your husband has a criminal history?

A Yes.

Q You're aware that he was convicted in 1995 of possession of a controlled substance?
A Yes.
Q And that following that conviction, he was sentenced to 70 months in prison. You're aware of that time that he spent.
A Yes.
**MS. ALLEN-MCCOY**: I'll pass the witness, your Honor.
**MR. MALDONADO**: Could I clarify something, your Honor, briefly?
**THE COURT**: Briefly.

**REDIRECT EXAMINATION**

**BY MR. MALDONADO**:
Q It's about the questions asked about a business in Mexico. Is that your husband's business or his brother's business?
A I'm not sure of what business. We had a business, but after 2004, it no longer continued.
Q All right. And that's an air conditioning business; is that right, ma'am?
A Yes.
Q In which air conditioning units were being imported from Korea or Japan; is that right?
A Yes.
Q But your husband bought out of that business, and he is no longer involved since 2004; is that right?
A Yes, true.

Q I just wanted to clarify that.

**MR. MALDONADO**: Thank you, Judge.

**THE COURT**: Okay. Anything else?

**MS. ALLEN-MCCOY**: Nothing further, your Honor.

**THE COURT**: You may step down.

**(WITNESS EXCUSED)**

**THE COURT**: Mr. Welch, do you have any other witness? Mr. Maldonado, do you have another witness?

**MR. MALDONADO**: Oh, I'm sorry. No other witnesses, your Honor. Thank you, Judge.

**THE COURT**: Mr. Welch?

**MR. WELCH**: Thank you, your Honor. Your Honor, I have no witnesses although I do have family members here today. I would ask the Court to take notice of the contents of the Pretrial Services Report.

Ms. Gonzalez has her sister here today. She has her ex-mother-in-law here today. She has her family here today. She has very strong support in Roma. The Court knows she has lived in Roma since she was a small child. She has two children that are United States citizens. She has no prior criminal history.

The only contact she has in Mexico are her elderly grandparents, your Honor. They live in Cuidad Miel (phonetic). The rest of her family lives here in the Roma area. Both of her children, as I said, are United States citizens.

She would have every incentive to stay here in the United States, your Honor, and I don't believe she's a risk of flight. I think the Court has a pretty good idea of what her role is in this case, your Honor, and we would ask the Court to follow the recommendation in the Pretrial Services Report.

I believe those are conditions that can be met. Certainly they probably can't meet them today or immediately, but I do believe that they are conditions that can be met, and her family members are here today and available to interview with Pretrial Services. It's possible to observe these should the Court see fit to follow their recommendation.

**THE COURT**: Okay. Okay, the Court has taken judicial notice of the Pretrial Services Report as to each Defendant.

**MR. MALDONADO**: Your Honor, I'm sorry. Can I say something else, your Honor, regarding --

**THE COURT**: Not right now. Hold on.

**MR. MALDONADO**: Yes.

**THE COURT**: Okay. I need to get -- to hear the recommendations from the Government.

**MS. ALLEN-MCCOY**: Your Honor, with regard to each of the Defendants, the Government is asking that they be detained without bond at this time.

I would ask the Court to consider the seriousness of the charges that are facing the Defendants, especially with Mr. Rivera and Mr. Cruz, and Mr. Garcia.

There is electronic surveillance that directly ties them to making phone calls to members of the Gulf Cartel. Each, Mr. Rivera, Mr. Cruz, and Mr. Garcia, have each been found in the possession of weapons, semiautomatic weapons, assault rifles at their residences, and at the time that they were arrested.

There's also a huge amount of cash that is involved here. The amount that's actually been seized, each occasion, in February of '08, there was over $2 million. Both in March and April, there were about a million -- a million four on one occasion; a million two on another occasion.

So, an incredible amount of money that's being -- that's going south across the border to the Gulf Cartel, and large amounts of drugs, tons of marijuana, and hundreds of pounds of cocaine that are being shipped north to Houston.

I would ask the Court to consider that. Additionally, there -- the weight of the evidence. We have electronic surveillance and numerous phone calls with regard to Mr. Rivera, Mr. Cruz, and Mr. Garcia. The physical surveillance where they've been actually seen doing counter surveillance during the shipments of the bulk currency.

Additionally, with regard to Mr. Rivera, he does have ties to Mexico. He has family members living over there. Certainly appears to have economic ties to Mexico. Owned a Mexican based company for approximately six years.

He does have a criminal history we'd ask the Court to consider. He has two felony offenses. I do understand that they are a little bit removed in time, 1993 and 1995, respectively, but certainly very serious charges that he was convicted of.

And again, he has --

**THE COURT**: But as far as the '95 conviction, it's still a conviction that will be considered for enhancement purposes?

**MS. ALLEN-MCCOY**: I believe it can be, yes, your Honor.

**THE COURT**: Okay.

**MS. ALLEN-MCCOY**: And he had an assault rifle during -- found during the search of his residence as well as other weapons.

With regard to Mr. Cruz, he was born in Mexico, certainly has some ties to Mexico, some family members that still reside there.

According to the Pretrial Services Report, he travels to Mexico a couple of times a month. His education was done in Mexico.

And again, the issue with regard to the possession of firearms at the time of his arrest.

With regard to Mr. Garcia, again, he has ties to Mexico, he resided in Mexico for 15 years. There also may be

an issue of substance abuse, and he also was in the possession of firearms at the time of his arrest.

And it appears Mr. Cruz and Mr. Garcia were very tied in with the Gulf Cartel as evidenced by electronic surveillance and phone calls that were intercepted.

With Ms. Gonzalez, the Government does concede that she appears to be less involved than the other three Defendants. She also has some family ties to Mexico, but the Government is requesting that she be detained without bond because she did play a significant role as a passenger in the vehicles, assuming to avoid detection, carrying bulk currency of over $2 million.

So there is certainly an involvement there, and based on her debriefing after she was arrested, or her interview after her arrest, she did indicate that she had done that on more than one occasion, her involvement.

So, based on those reasons, your Honor, the Government is asking for detention.

**THE COURT**: Okay. Let's start with Mr. Cruz.

**MR. GUY WOMACK**: As your Honor --

**THE COURT**: Are you --

**MR. GUY WOMACK**: As your Honor has already noted from looking at the Pretrial Services Report, and of course they work for the Court, they don't have a dog in this fight so to speak. They're not taking sides.

They told you that Mr. Cruz is 38 years old. He is a U.S. citizen, naturalized. He's lived here all of his adult life, came here when he was 16.

He's married. Been married for 15 years. His wife, who is here in court. Members of his family are here as well. Other members.

Your Honor, he has very close ties to this community. He is not a flight risk, and he's not a danger to the community. He owned a weapon at his home as he should. He has a concealed handgun license.

There were no contraband of any kind found at his home. No drugs, no large amounts of cash.

But anyone living in Texas, you know, who is a U.S. citizen or a lawful current resident, with no prior convictions, may have firearms.

There's no suggestion by the Government that Mr. Cruz has attempted to use a weapon in defending drugs, or defending bulk currency transactions, or anything like that. Merely for home defense. He had a weapon in his home.

He was arrested without incident. Although he was up and about, he did not resist in any way. He's been extremely cooperative with the Government, and Pretrial Services has recommended that he be given a bond, that it be $100,000 with ten percent down.

He will certainly do that, your Honor, and if you

would like for his family to sign on, they will be glad to do that as well. Plus, he owns his home in Roma, and it's worth quite a bit more than the recommended deposit. Almost four times that. So, that is also something he could pledge as well.

And we'd ask that he merely surrender his passport and be allowed to stay on bond under the conditions as recommended by Pretrial Services.

Thank you.

**THE COURT**: Okay. For Mr. Garcia.

**MR. GEOOFF WOMACK**: Yes, your Honor. Again, the Pretrial Services Report speaks for itself, your Honor. Mr. Garcia is a 43-year-old man, has lived in the United States for 23 years in Roma, Texas. Every one of his family members lives in Roma. He's got nine brothers and sisters, his mother, his wife, and his two children.

He owns his home outright, and three vehicles as well, which I believe total is about six or seven times the recommended $10,000 deposit for a bond.

Mrs. Garcia is in the courtroom. She's willing to sign on as a co-surety.

Mr. Garcia has had some problems in the past with marijuana use and a little bit of cocaine.

Pretrial Services recommends that he be detained just shortly for an evaluation. Any help for Mr. Garcia is very

welcome, your Honor.

If he's out on bond, he's to maintain employment. The rabbit ranch has already said that they would maintain Mr. Garcia as an employee.

Thank you, your Honor.

**THE COURT**: Mr. Maldonado.

**MR. MALDONADO**: Yes, your Honor. First of all, your Honor, I'd like to mention to the Court that in the report -- Pretrial report, there is an error.

He has no arrest for any burglary of the vehicle in '93, Judge. We simply don't know where that's coming from. We acknowledged that he was arrested in '95, but this burglary of a vehicle in Hidalgo, sentenced to two years, is not him. I'm not sure how it got attached to Mr. Rivera, but that's not true, and I can get information I'm sure to clarify this if this is what the Court needs.

It states a Case Number. It would be very easy to find out. I'm not sure what the error is, Judge.

**THE COURT**: Okay.

**MR. MALDONADO**: And also, Judge, I would like to start by saying that Mr. Rivera is a very successful businessman in this area. Like many persons in this area, they have some relationship to Mexico, but all his business, all his dealings, all his family, his immediate family, is here in this area.

He has a very successful business that he wishes to continue to work, that he's worked very hard for, and he has no incentive not to continue to go on with this business forward.

He will show up to every court hearing that the Court asks for.

He's got his wife here. He's got his children being educated. Getting fine educations here in this area, and he wishes that to continue also.

As to the weight of the evidence, your Honor, I believe that the Government makes it sound like they have a very, very strong case against my client. What they have is a limited time period, at least per the testimony of the agent today, a limited time period in which there is some phone calls in which they say my client participated after April '08 in which there was a seizure, and May '07.

And as we know, Judge, the '07 seizure, there was some determination obviously by some officials of the state that that money should be returned, or part of that money. This is the money they're now claiming is proceeds from drug activity.

They don't have Mr. Rivera, going back to the weight of the evidence, being involved with any other Defendant here, speaking to any other Defendant here, being associated with any other seizures of money, and has been testified to this Court, Mr. Rivera's business deals in a great deal of money in his

account. Personal account of the business in which wire transfers are being made from refinery companies. At times, totaling over a million dollars. And some of that money is being withdrawn in cash, and we feel that those are factors to consider as to the weight of the evidence.

The Government said that my client has some economic basis or connection to Mexico, and that's simply not true, Judge. He did own a company. He was a partner in an air conditioning company that he no longer is a business of. He bought out his shares. He is strictly working this business, and there's actually a few other businesses out there as the Court can tell from his Pretrial Report.

So, he's got every incentive to continue to be here. He was born in the United States, and he wishes to stay here, Judge.

And for that reasons and the reasons listed in the Pretrial Report, we're asking the Court to adopt that and grant my client a bond, Judge.

Thank you for your time.

**THE COURT**: Okay.

**MR. WELCH**: Thank you, your Honor. I've already made a presentation. Just a couple of things in addition I'd point out, your Honor.

Your Honor, Ms. Gonzalez has known for seven months that she was going to get a knock on the door or a phone call

to come in. If she were inclined to be a flight risk, she could have easily done that, your Honor.

As I stated before, she has two young children that are the primary concern of her life. She's worked as an assistant manager at a pawn shop in Roma for the last three years. She doesn't make -- isn't supported by the kind of business that she's allegedly involved with today, your Honor.

She has every incentive to stay here in the United States, your Honor, and for that reason we would ask the Court to follow the recommendation.

**THE COURT**: Okay. The Court is ready to make a finding.

The Court has taken judicial notice of all the Pretrial Services Report. The Court has taken into consideration the testimony of the agent.

At this time, as to Mr. Cruz, and Mr. Garcia, and Rivera, the Court will find that there are no conditions or combination of conditions that would secure the appearance of either Defendant or the safety of the community.

The Court finds that the presumption has not been rebutted, and at this time, all of you are remanded to the custody of the Marshals.

As to Ms. Gonzalez, the Court has taken into account that you are a permanent resident alien. However, there is no INS detainer at this time.

The Court notes that you do have substantial social and economic and family ties in the United States, although a few also in Mexico. The Court does consider the weight of the evidence at the time -- as presented by the agent, but the Court believes there are conditions of release that would secure your appearance as well as the safety of the community, and bond will be set at a hundred thousand, with a five percent cash deposit.

The Court will require the signature of two co-sureties to secure the remaining balance of the bond, or as many co-sureties as are necessary to secure the remaining balance.

Travel will be restricted to Starr County. You will be allowed to travel to Houston, Texas, for court appearances and consultations with your attorney.

As you were -- there is no conflict with the Public Defender's Office, so she will likely be represented by the Public Defender in Houston. Okay?

So, you will need to travel to visit with him as is necessary.

You'll be under Pretrial Services supervision. I do want her on GPS monitoring. As to the limits on her travel, there will be no travel whatsoever to Mexico.

No illegal drug use. Drug testing and treatment as deemed necessary. No weapons.

You are to continue working. No excessive alcohol use.

Until the deposit is made, the co-sureties interviewed and approved, you are remanded to the custody of the Marshals.

Let me advise you, if you fail to show up for court or surrender pursuant to any sentence imposed as directed, you are facing additional criminal charges for failure to appear, and that can mean another ten year term of imprisonment, and up to a $250,000 fine.

Do you understand that?

**DEFENDANT GONZALEZ**: Thank you, your Honor.

**THE COURT**: Okay. Now, as to the other Houston cases, I did give a timeframe of -- this needs to be taken care by Friday or they will be transported to Houston. Okay?

Now, I don't know what the conditions in Houston are as far as the courts operating or not. My understanding is everything is functional.

**MR. WELCH**: I think it is, your Honor.

**THE COURT**: All right. If there is additional information you wish to present to the Court, you'll need to do so to the court in Houston. Or if you wish to appeal this Court's ruling, you'll need to do so in Houston. Okay?

**MR. MALDONADO**: Thank you, Judge.

**MR. WELCH**: Thank you, your Honor.

**MR. WOMACK**: Thank you, your Honor.

**THE COURT**: Thank you.

**(Proceeding adjourned at 2:42 p.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**October 17, 2008**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***